# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

WILLIAM C. ECKHARDT,

                    Plaintiff,

          vs.                                        Case No. 03-C-1465

NSI ELECTRICAL CONTRACTORS, INC.,

                    Defendant.

# DECISION AND ORDER

          William C. Eckhardt ("Eckhardt"), commenced this action against his former employer, NSI Electrical Contractors ("NSI"), in the Circuit Court of Milwaukee County, Wisconsin under the Wisconsin Fair Employment Act ("WFEA"), Wis. Stat. §§ 111.31-111.395; Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e-2(a) and 2000e-3(a) as amended by the Civil Rights Act of 1991, 42 U.S.C. § 1981A *et seq*.; the Age Discrimination in Employment Act of 1974 ("ADEA"), 29 U.S.C. § 626 *et seq*. Eckhardt's complaint sets forth three causes of action: age discrimination under the WFEA, Title VII, and the ADEA (Count I); wilful age discrimination under the ADEA (Count II); and retaliation under the WFEA, Title VII, and the ADEA (Count III).

The Court has federal question jurisdiction over this action under 28 U.S.C. § 1331 because Eckhardt's federal discrimination claims are brought under federal laws and statutes. Supplemental jurisdiction over Eckhardt's WFEA claims is afforded by 28 U.S.C. § 1367(a). Venue is proper under 28 U.S.C. § 1391.

NSI's motion for summary judgment and Eckhardt's motion to exclude will be addressed herein.

*Motion to Exclude*

Eckhardt seeks an order excluding NSI's March 14, 2005, filings in reply to Eckhardt's opposition to NSI's motion for summary judgment. Eckhardt asserts that NSI did not timely file its reply within 15 days of Eckhardt's February 23, 2005, filings.

With respect to motions for summary judgment, Civil L.R. 7.1(c) (E.D. Wis.) provides that a movant shall serve a reply brief and, when necessary, affidavits or other documents within 15 days of service of the response brief. Rule 6(e) of the Federal Rules of Civil Procedure governs the computation of time, providing that the day from which a designated period begins to run shall not be included when calculating the due date, but the last day of the period shall be included unless (as relevant to this case) it is a day of the weekend. Due dates falling on the weekend fall on the next day which is not one of the aforementioned days.

Rule 6(e) of the Federal Rules of Civil Procedure provides that three days are to be added to a prescribed period whenever a party is to do some act after the service of a notice or paper pursuant to Fed. R. Civ. P. 5(b)(2)(B), (C) or (D).

-2-

Applying the foregoing rules, NSI's reply was to be filed no later than March 14, 2005. The 15-day period under Civil L.R. 7.1(c) began to run on February 24, 2005, (the day after Eckhardt filed his response to NSI's summary judgment motion) and ended on March 10, 2005. Adding three days as required by Fed. R. Civ. P. 6(e), the deadline fell on March 13, 2005 — a Sunday. Following the rule for deadlines that fall on weekends, NSI's reply was due the following day, March 14, 2005, and, that is the day on which it was filed. Thus, NSI's filing was timely and Eckhardt's motion to exclude NSI's reply is denied.

### Motion for Summary Judgment

NSI seeks summary judgment dismissing all of Eckhardt's claims on the ground that there is no genuine issue of material fact to sustain Eckhardt's claims as a matter of law. Eckhardt's brief in opposition to the motion addresses only NSI's arguments related to his ADEA salary reduction and termination claims. (*See* Pl.'s. Reply Br. in Opp'n to Def.'s Mot. for Summ. J. at 1.)

### Standard for Summary Judgment

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also, Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). A party "opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial."

*Doe v. Cunningham*, 30 F.3d 879, 883 (7th Cir. 1994) (quoting *Anderson*, 477 U.S. at 248; also citing *Celotex Corp.*, 477 U.S. at 324; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *United States v. Rode Corp.*, 996 F.2d 174, 178 (7th Cir. 1993)).

"Material facts" are those facts that under the applicable substantive law "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over "material facts" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The burden of showing the needlessness of a trial – (1) the absence of a genuine issue of material fact and (2) an entitlement to judgment as a matter of law – is upon the movant. In determining whether a genuine issue of material fact exists, the Court must consider the evidence in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 587.

Failure to respond to a summary judgment motion does not automatically result in judgment against the non-moving party. *See Doe*, 30 F.3d at 883. "A party is never required to respond to a motion for summary judgment in order to prevail since the burden of establishing the nonexistence of a material factual dispute always rests with the movant." *Id.* (citations omitted).

*Relevant Facts*[1]

*NSI*

NSI, a Wisconsin corporation located in Milwaukee, Wisconsin, is an electrical contracting company that installs electrical systems in commercial and residential buildings. Electrical contracting is a competitive business. Typically, NSI finds prospective projects and prepares and submits bids for the work. Generally, several bids from competing companies are submitted to a general contractor, who awards the job to the electrical contractor with the best or lowest bid.

NSI has office staff and field staff. The office staff consists of administrative personnel, including the owners, project managers/estimators, and clerical staff. The field staff consists of electricians who actually perform the electrical work.

Leon Balthazor ("Lee")[2] and Kathleen Balthazor ("Kate") (collectively "the Balthazors"), husband and wife, are the owners and sole shareholders of NSI. Lee, born on

---

[1]The following facts are based upon the parties' proposed findings of fact ("PFOF") to the extent they are undisputed. However, citations to all quoted material are provided even though such facts are undisputed.

Eckhardt responded to a number of NSI's proposed findings of fact stating that he "lacks information sufficient to admit or deny the allegation"and places the burden of proof on NSI. (*See* Pl.'s Disputed Proposed Findings of Fact and Conclusions of Law, ¶¶ 53, 54, 71, 72 & 99.) This response to NSI's proposed findings of fact does not comport with Civil L.R. 56.2(b)(1) (E.D. Wis.), which requires that "[A] specific response to the movant's proposed findings of fact, clearly delineating only those findings to which it is asserted that a genuine issue of material fact exists. The response must refer to the contested finding by paragraph number and must include specific citations to evidentiary materials in the record which support the claim that a dispute exists." Eckhardt's response to proposed findings of fact ¶¶ 53, 54, 71, 72, and 99, does not raise a factual dispute as to those facts.

Furthermore, Rule 56(e) of the Federal Rules of Civil Procedure provides that "[s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Statements outside the affiant's personal knowledge or statements that are the result of speculation or merely conclusory do not meet this requirement. *See Stagman v. Ryan*, 176 F.3d 986, 995 (7th Cir. 1999)(citing *Box v. A & P Tea Co.*,772 F.2d 1372, 1378 (7th Cir. 1985)). Hearsay evidence is also inadmissible. *Friedel v. City of Madison*, 832 F.2d 965, 970 (7th Cir. 1987). Where objected to by a party, proposed findings of fact which do not meet the evidentiary standard of Rule 56(e) have been excluded.

[2]Three individuals with the last name "Balthazor," figure prominently in this action. For simplicity of reference, this decision and order will refer to them by their first names.

October 23, 1943, is the president of NSI. Kate, born on February 15, 1948, is the administrator of NSI. Kate is responsible for maintaining personnel files and records, supervising clerical employees, maintaining accounts receivable and accounts payable, and maintaining records to submit to NSI's accountant.

The Balthazors' son, Andrew Balthazor ("Andrew"), has held a variety of positions at NSI including electrical helper, apprentice, journeyman, chief estimator and vice president. Andrew received in-house training as an estimator for NSI beginning in 1996 or 1997. On August 29, 1997, Andrew was in "year two of a five year plan to transition [himself] from field electrician." (*See* Katarincic Aff. in Supp. of Pl.'s Reply Br. in Opp'n to Def.'s Mot. for Summ. J. ("Katarincic Aff.") ¶ 8, Ex. 7.)

Andrew became vice president in 1999. The end of Andrew's five-year plan coincided with the year he began performing employee evaluations of field workers and estimators. (Katarincic Aff. ¶ 6, Ex. 5 (A. Balthazor Dep. at 7).) Andrew's current job title is "Executive Vice President of Estimating and Project Management." It is Eckhardt's understanding that Andrew will take over NSI someday. Andrew was 31 years old as of October 2002. (Katarincic Aff. ¶ 2, Ex. 1 (Def's Resp. to Pl.'s First Set of Interrog. and Req. for Produc. of Doc., Interrog. No. 1).)

*Eckhardt's Employment With NSI*

Eckhardt, born June 16, 1944, resides in Franklin, Wisconsin. Eckhardt worked in Wisconsin from 1965 to 1981 for Ace Electric Company as a construction electrician foreman. He received a journeyman electrician license in 1970.

Lee hired Eckhardt, who began his employment at NSI on June 19, 1990. At that time, Eckhardt was 46 years of age. Eckhardt was employed as NSI's project manager during the entire term of his employment. Lee terminated Eckhardt's employment on September 30, 2002.

While employed at NSI, Eckhardt reported to Lee. He also reported to Andrew, which consisted of responding to Andrew's questions about Eckhardt's current projects.

As project manager, Eckhardt worked on projects after NSI was awarded contracts. He supervised and managed projects and was responsible for project profitability. If there were modifications to a project he was managing, Eckhardt monitored all estimating and negotiating of change orders and extra work orders.[3] Eckhardt also reviewed or recapped estimates that had been prepared by NSI estimators on larger projects. In 1992, Lee gave Eckhardt the title of vice president.

Lee told Eckhardt about twelve to fourteen times: "Well, you know you're getting older, and your insurance is costing us a lot of money. And you know, compared to – you know, your age is what is driving our insurance premiums way up." (Katarincic Aff. ¶ 2, Ex. 2 (Eckhardt Dep.) at 132.) Over the course of two to three years, Lee continuously asked Eckhardt when he was going to be retiring. Eckhardt also heard comments concerning a "new regime" beginning for NSI. Both the retirement and the new regime comments were being made

---

[3]The parties' proposed findings of fact do not define a "change order" or "extra work order." However, Eckhardt testified that a change order involves a proposal and an extra work order involves doing work on a time and material basis. (*See* Katarincic Aff. ¶ 2, Ex. 2 (Eckhardt Dep.) at 24.)

approximately two years prior to the 2002 reduction of NSI's office worker salaries. The new regime referred to Andrew eventually taking over the company.

On February 14, 2002, Eckhardt received a $1,000 bonus.[4] Throughout his employment with NSI, Eckhardt was its highest paid employee. His 2002 salary was between $113,000 and $114,000.

*March 2002 Incident*

On March 12, 2002, Lee met with Eckhardt and informed him that he was removing his vice president title. Lee made this decision based on an incident in which Mark Herzog ("Herzog"), NSI's purchasing manager, overheard Eckhardt in a discussion with a vendor term Herzog an "asshole" (*See* Def.'s Proposed Findings of Fact ("PFOF") ¶¶ 30, 32.) During a meeting with Eckhardt, Lee explained his decision by recounting the episode and inquired, "Did you call him an asshole?" (Def.'s PFOF ¶ 33.) Eckhardt admitted making the comment. At that time, Eckhardt's compensation, benefits, and job duties remained the same. Lee believed that Eckhardt's statement to a vendor about Herzog exhibited poor judgment and tarnished the image of NSI.

Lee was not aware of any other instances of NSI employees using profanity around a vendor. Lee expected that NSI employees would not use derogatory names when speaking of each other to NSI's vendors. He was concerned about the professional image of NSI employees, particularly in front of vendors. Eckhardt's age was not a factor in Lee's decision to strip the title of vice president from Eckhardt.

---

[4]Eckhardt also received a $1,000 bonus, on May 23, 2002.

*NSI's Financial Situation*

In 2000, NSI had a net financial loss of $219,200. In 2001, NSI cut its total selling and administrative expenses by $225,279 compared to the 2000 level. The reduction in expenses was achieved because Lee and Kate reduced the money they took from the business and because NSI had three fewer office staff employees in 2001 than in 2000. Still, NSI showed a net financial loss of $252,680 in 2001.

In 2002, NSI hoped to improve sales, so that its financial situation would improve. NSI discussed the need to refine estimates to make them more competitive in order to increase sales. However, NSI's sales did not increase. Eckhardt was the only NSI employee who received any bonus in 2002. Neither Kate nor Lee received a bonus in 2002.

During 2002, NSI reduced expenses by not enrolling any apprentices and, thereby, eliminated $15,000 in costs. NSI also reduced its reimbursement for employees' continuing education courses. Additionally, NSI cancelled office cleaning services, the publication of a company newsletter, and subscriptions to trade magazines and associations. NSI eliminated a company-sponsored social picnic, shopped for different insurance, and changed phone line services to reduce expenses. As a cost-cutting move, NSI decided to not fill certain positions vacated by departing employees. Even with these measures, NSI laid off field staff because the number of workers exceeded the available work.

Despite cutting costs, NSI expended some of its funds. In August 2002, Lee purchased a new vehicle, a Savanna, for business use by NSI for $18,754. The monthly payments

on the vehicle were $310.83. In September 2002, NSI bought two more new vehicles for business use. The monthly payments on those vehicles were $627.06 and $390.48. At the end of September 2002, NSI's assets were approximately $874,876 and its liabilities were approximately $680,460.

At the end of 2002, NSI's sales level was $29,502 less than the unprofitable 2001 sales. However, in 2002, NSI had a net income of $10,613, compared to an overall loss of $252,680 for 2001. NSI's 2002 year-end profit was not enough to support the continued salaries of Eckhardt and Hertzog. NSI's total administrative salaries for 2002 was only $6,065 less than for 2001.

Despite its efforts to cut expenses in 2002, NSI had less flexibility to make substantial cuts because salaries were already reduced from 2001, but NSI cut about $6,000 more from salaries during 2002. Additionally, some of the cost-savings NSI implemented in 2002 were not realized until 2003. Likewise, the salary reductions implemented in 2002 were not fully realized until 2003.

The 2002 financial statements show that total sales and administrative expenses in 2002, ($676,662) were virtually unchanged, showing only a $1,656 reduction from 2001's $678,318. NSI's financial statements show that cost-cutting measures related to sales and administrative expenses, which included office staff salaries allegedly targeted for reduction, were more rigorously implemented between 2000 and 2001.

Eckhardt never reviewed NSI's profit and loss statements, or cash flow documents relating to NSI's financial status.

*Salary Reductions*

Because of its financial problems, in August 2002, NSI resolved to reduce further costs. On August 15, 2002, Lee informed Eckhardt that his pay would be reduced to $75,000. Lee told Eckhardt: "You're getting your salary reduced, and if you don't like it, you can quit. And let me know tomorrow." (Pl.'s PFOF ¶ 19.) Eckhardt viewed these statements as an "ultimatum." (Katarincic Aff. ¶ 3, Ex. 2 at 70.) In August 2002, NSI reduced salaries of its other employees[5] as follows: Andrew's salary was reduced from $80,000 to $75,000; Stephen Marsicek's ("Marsicek") salary was reduced from $50,000 to $45,000; Herzog's salary was reduced from $65,000 to $50,000; Martin Weeks' ("Weeks") salary was reduced from $52,500

---

[5]In attempting to raise a factual dispute regarding the amount of salary reduction, Eckhardt proffered a document bearing the title "Title and Total Wages for NSI Office Employees Years 2000 to 2003." (Katarincic Aff., Ex. 24.) Counsel for Eckhardt has simply identified the document as being a true and correct copy of the "Title and Total Wages for Defendant's Employees for 2000 to 2003." (*Id.* at ¶ 25.) Eckhardt does not provide any further foundation for the document. He does not provide information about the origin of the document or its author.

In response, NSI submitted a second affidavit of K. Balthazor, wherein she avers that the document shows wages actually paid to the employees in the years 2000, 2001, and 2002; it does not show the employees' annual salary amount or the percentage by which their salaries were reduced. (Second Aff. of K. Balthazor in Supp. of Def.'s Mot. for Summ. J. [Second K. Aff.], ¶ 15.) Therefore, the document does not provide the Court with information related to the percentage by which salaries were reduced or the raw dollar value of their reductions. Kate further avers that because Eckhardt's employment was terminated on September 30, 2002, his wages paid in 2002 are less than his salary amount. The explanatory information provided in Second Affidavit of K. Balthazor is uncontroverted and is based on personal knowledge. Thus, Eckhardt has not created a dispute regarding the amounts by which other NSI employees' salaries were reduced.

to $45,000; Lucas Raap's ("Raap") salary was reduced from $37,440 to $33,000.[6]  In 2002, Lee and Kate worked full-time at NSI, but received no salary.

NSI's financial status was identical when Lee determined the amounts for each employee's salary reduction, as all salary reductions were made at the same time.  Lee, alone, made the decision to reduce salaries; however, he had input from Kate on the issue.  Lee did not use any percentage or formula to determine the appropriate amount of each salary reduction. Rather, after looking at overhead and previous cuts, Lee determined the amount of each salary reduction by evaluating how much he could reduce the employee's salary and still leave the employee with a livable wage.  Lee never stated that Eckhardt's job performance was a reason for the salary reduction.

---

[6]In proposed findings of fact paragraph 49, Eckhardt asserts that the other employees whose salaries were allegedly reduced were 28, 32, 32, and 41 years old. (Pl.'s PFOF ¶ 49.) In support thereof, Eckhardt cites "Defendant's Exhibit A, Attachment 2," his  administrative "Employment Discrimination Complaint," filed with the State of Wisconsin, Department of Workforce Development, Equal Rights Division ("ERD").  That document states that "I declare that this complaint is true and correct to the best of my knowledge and belief."  NSI opposes this proposed finding of fact maintaining that Eckhardt's evidentiary citations do not support this proposed finding of fact. (Def.s Resp. to Pl.'s Proposed Findings of Fact ¶ 49.)  NSI objects on the ground of hearsay and lack of personal knowledge.  (*Id.* (citing *Friedel*, 832 F.2d at 965; *Adusumilli v. City of Chicago*, 164 F.3d 353 (7th Cir. 1998).)  The cases cited by NSI state general propositions of law regarding hearsay and affidavits being based on personal knowledge, but do not directly address the issue of a summary judgment affidavit based on "knowledge and belief."

An affidavit which asserts various facts "on information and belief," is not enough to satisfy the personal knowledge requirement for summary judgment affidavits. *See Weiss v. Cooley*, 230 F.3d 1027, 1034 (7th Cir. 2000).  At least, one district court has allowed evidence based on "knowledge and belief"on a motion for summary judgment. *See Mellen v. Hirsch*, 8 F.R.D. 248, 249, 250 (D.C. Md. 1948).

In *Draghi v. County of Cook*, 991 F.Supp. 1055, 1057 (N.D. Ill. 1998), the court pointedly observed: "any statement that things are true to the best of someone's 'personal knowledge and belief' is not really any affidavit at all – it is wholly ineffective as a sworn statement of the actual truthfulness of the assertions referred to."  This Court concurs.  Rule 56(e) of the Federal Rules of Civil Procedure mandates that affidavits be made on "personal knowledge."  Therefore, stated ages of Eckhardt's co-workers whose salaries were also reduced in August 2002, are not included in the relevant facts because they are not predicated on admissible evidence; that is, an affidavit based on "personal knowledge."

The Court notes that NSI's responses to Eckhardt's first interrogatory state that Weeks was 41 years of age as of October 2002, and Andrew was 31 as of October 2002.  Such responses were filed by both parties as part of their summary judgment submissions, but neither party cited Interrogatory No.1.  (Katarincic Aff. ¶ 2, Ex. 1; Hanneman Aff. in Supp. of Def.'s Mot. for Summ. J. (Hanneman Aff.) ¶ 7, Ex. F.)  The Court has included those ages in its statement of relevant facts.

*Termination of Employment*

After reducing salaries, Lee decided it was necessary to terminate Eckhardt's employment.[7]  Lee terminated Eckhardt's employment on September 30, 2002, because NSI was losing money and needed to continue cutting costs.  As of the end of August 2002, the last month for which financial information was available before the termination decision, NSI posted a $25,559 loss.  Lee did not have NSI's year-end 2002 financial statements when he terminated Eckhardt's employment.

Eckhardt received two months severance pay at the time of his termination pursuant to an existing agreement he had with NSI.  Eckhardt was 58 years old, both at the time of his salary reduction on August 15, 2002, and the termination of his employment on September 30, 2002.

Herzog's employment was terminated during the same time period in 2002.  Lee believed that NSI did not have enough work to justify the overhead for a project manager (Eckhardt's position) and a purchasing manager (Herzog's position).  Lee believed that the positions held by Herzog and Eckhardt related to only one function and that, because there were fewer projects in September of 2002 which required their individual skills, their positions were expendable.

After terminating Eckhardt's employment, NSI did not hire another project manager.  Eckhardt was the only employee who worked solely as a project manager for NSI.

---

[7]Andrew was present in meetings in which Eckhardt's employment was discussed with Eckhardt, but Andrew did not say anything to Eckhardt during the meetings relating to his employment.  Andrew did not make or participate in any decisions with respect to Eckhardt's employment including the decision to remove Eckhardt's vice president title.  Andrew also did not participate in the decision to reduce salaries of NSI employees in 2002.

No other NSI employee had the same or similar job responsibilities as Eckhardt. After Eckhardt's termination, existing personnel took over his pending projects. Lee assumed the duties of project manager for two projects. Weeks took over one project and Andrew took over another project.

*Administrative Discrimination Charge*

Eckhardt filed a Discrimination Complaint with the ERD and the Equal Employment Opportunity Commission ("EEOC") on October 24, 2002 (collectively "the EEOC charge"). The EEOC charge alleged that NSI discriminated against Eckhardt based on his age. Eckhardt did not allege in his EEOC charge that NSI retaliated against him or that NSI failed to rehire him. Eckhardt testified that he had no idea why he was not rehired in November 2002. Eckhardt did not apply for a position at NSI in March 2003.

*Eckhardt's Claims*

Eckhardt claims that he was "demoted," his salary reduced and his employment terminated because of the "new regime"; i.e., Andrew and "younger project managers." (Def.'s PFOF ¶ 82.) Weeks, Marsicek and Raap are the individuals Eckhardt refers to as "younger project managers." (Def.'s PFOF ¶ 83.) Eckhardt claims that Lee used the phrase "generation gap" and told him that "us old guys don't think the same way." (Def.'s PFOF ¶ 84.) Eckhardt did not know the context in which Lee used the phrase "generation gap." (Def.'s PFOF ¶ 85.)

Eckhardt claims that Lee told Eckhardt, when referring to an employee whose first name was "Morry," that "he was too old. That's why I am firing him." (Def.'s PFOF ¶ 88.) NSI, however, never terminated the employment of a person named "Morry." (Def's PFOF ¶ 89.)

Also, Eckhardt stated that Mike McWilliams ("McWilliams"), a non-NSI employee, told him that, one week after Eckhardt's employment had been terminated, Andrew said to McWilliams that Eckhardt was "old and one-dimensional." (Def.'s PFOF ¶ 90.)

*Estimators*

Despite the 2002 cutbacks, Lee decided to retain those employees at NSI who functioned primarily as "estimators." At NSI, "estimators" prepare bids for new jobs. Lee believed that NSI's sales would increase if NSI increased the number of quality bids on potential projects. Accordingly, the maintenance of the estimator positions was necessary for NSI's viability. Lee believed that, in addition to preparing bids, several estimators could also perform project management functions. Thus, the estimators could focus on the necessary task of securing new business and, if their bids were successful, NSI could also manage those projects with existing personnel. No new or additional employees would be necessary.

Four individuals primarily prepared bids or estimates for NSI: Andrew, Raap, Weeks, and Marsicek. These four estimators used Accu-Bid, the software program used by NSI to create bids or estimates for submissions to prospective customers. Eckhardt did not use any such software to create bids/estimates for new jobs while he was employed at NSI, nor did he know anything about the Accu-Bid software. Eckhardt did not use the computer in his office. Eckhardt had an understanding of complex plans and specifications and, therefore, he occasionally reviewed completed estimates and suggested modifications, although he did not have expertise in creating an estimate. Lee never considered offering Eckhardt a job as an estimator at a reduced salary.

Raap's employment with NSI began on September 2, 1997, when Lee hired him as an electrical helper. Raap had no electrical experience prior to being hired by NSI. Raap received training on Accu-Bid by means of in-house mentoring by Marsicek at NSI's office. As of March 14, 2002, when an estimator trainee, Raap was deficient in the areas of project estimating software and understanding complex plans and specifications.

Raap was not proficient with Accu-Bid, but he could use the software. At the time of Eckhardt's termination, Raap was deficient in his ability to use the computer estimating software and in his understanding of complex plans and specifications. Eckhardt recalls that during 2002, Raap received two days of formal training on the Accu-Bid software at a seminar in Las Vegas, Nevada.[8] NSI paid for the costs of the travel and the course.

Marsicek began employment at NSI on September 2, 1997, as a CAD ("computer assisted design") operator. Lee hired Marsicek, who had no electrical experience prior to working for NSI.

Marsicek missed two months of work in 2001, due to back surgery. Marsicek received a raise in December 2001.

At his December 8, 2004, deposition, Marsicek testified that Eckhardt's lack of computer skills could make him "one dimensional." (Pl.'s PFOF ¶ 24.) He also testified that he never heard anybody comment about Eckhardt's age. (Katarincic Aff. ¶ 7, Ex. 6 (Marsicek

---

[8]NSI responded to paragraphs 75 and 99 of Eckhardt's proposed findings of facts asserting that Eckhardt has not shown that he has personal knowledge as to these facts. (*See* Def.'s Resp. to Pl.'s Proposed Findings of Fact, ¶¶ 75 & 99.) However, Eckhardt avers his affidavit is based on his "personal knowledge." (Eckhardt Aff.) NSI's conclusory statement has not created a factual dispute regarding that showing.

Dep.) at 11-12.) Marsicek stated that he did not believe that Eckhardt even knew how to turn on a computer.

Weeks' employment with NSI began on April 29, 2002, when he was hired by Lee as an estimator/project manager. He was hired because at that time NSI was beginning to focus its efforts on estimating so that it could increase sales to improve its business prospects. Weeks also could function as a project manager if he brought in any new business. Lee understood that Weeks had used software applications for estimating projects based on Weeks' demonstration of his abilities during his job interview. Prior to working for NSI, Weeks had eight years of electrical experience and 28 months of estimating experience — all Weeks' prior electrical experience was in Arizona. NSI paid for Weeks' training on use of an estimating program. After hiring Weeks, Lee did not hire any new employees before terminating Eckhardt's employment. Weeks was 41 years of age as of October 2002. (Katarincic Aff. ¶ 2, Ex. 1, Interrog. No. 1.)

### *Analysis*

Eckhardt opposes NSI's motion for summary judgment on his ADEA salary reduction and termination claims. A plaintiff with a potential discrimination claim can avoid summary judgment in one of two ways. Under the direct method of proving discrimination, the plaintiff must state facts showing that the employer's decision to take adverse employment action against the plaintiff was motivated by an impermissible consideration such as age. *Gusewelle v. City of Wood River*, 374 F.3d 569, 574 (7th Cir. 2004). Such facts can be in the form of direct or circumstantial evidence. *Id*. "Direct evidence essentially requires an admission by the decision-maker that his actions were based upon the prohibited animus." *Id*. (quoting *Rogers v.*

*City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003)). Circumstantial evidence must be sufficient to create a "convincing mosaic" that "allows a jury to infer intentional discrimination by the decision-maker." *Id.*

The indirect method, on the other hand, requires the plaintiff first to make a *prima facie* showing of discrimination. *Gusewelle*, 374 F.3d at 564 (citing *Steinhauer v. DeGolier*, 359 F.3d 481, 484 (7th Cir. 2004)). To do so, a plaintiff must show: (1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) a similarly situated employee not of the protected class was treated more favorably. *Id.*; *Cerutti v. BASF Corp.*, 349 F.3d 1055, 1061 (7th Cir. 2003). Once a plaintiff has made a *prima facie* showing of discrimination, the burden shifts to the defendant-employer to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Gusewelle,* 374 F.3d at 564 (citing *Steinhauer*, 359 F.3d at 484). If the employer can do so, the burden shifts back to the plaintiff to present sufficient evidence to show that the employer's proffered reasons are merely a pretext for discrimination. *Id.*

*Salary Reduction-Direct Evidence*

As direct evidence of age discrimination, Eckhardt asserts that he was the only employee that received a substantial salary reduction in August 2002 and that all of NSI's other salaried employees made more money in 2002, by either being recently hired or receiving promotions and pay increases in 2001 or 2002. However, Eckhardt has not presented evidence to support that contention. Despite construing the evidence and the reasonable inferences from that evidence in the light most favorable to Eckhardt, he has not raised a genuine issue of material

fact with respect to his contention that he was the only NSI employee that received a substantial salary reduction.

Eckhardt also states that comments concerning salary reduction from NSI prove that age was a determining factor in the reduction. A statement is direct evidence of discriminatory intent where the statement was made around the time of, and in reference to, the adverse employment action. *See Hunt v. City of Markham,* 219 F.3d 649, 652 (7th Cir. 2000). At the time that Lee told Eckhardt that he was reducing his salary, he told Eckhardt: "You're getting your salary reduced, and if you don't like it, you can quit. And let me know tomorrow." While temporally related to the salary reduction, this statement does not include any discriminatory content. Therefore, it does not qualify as "an admission by the decision-maker that his actions were based upon the prohibited animus." *Olson v. N. FS, Inc.,* 387 F.3d 632, 635 (7th Cir. 2004) (citations omitted).

Eckhardt also points to Lee's inquiries about retirement as direct evidence of age discrimination. However, those inquiries occurred biweekly for several years and lack a temporal connection to the salary reduction. Therefore, they do not constitute an admission by Lee that his decision was based on the prohibited animus. *Id*. (Finding that remark five months before the termination of salesmen's employment which was not made in direct reference to firing was not an admission.) Thus, with respect to his salary reduction claim, Eckhardt has not presented sufficient direct evidence of age discrimination.

*Salary Reduction – Indirect Proof*

The Court now addresses Eckhardt's indirect evidence of age discrimination in his salary reduction. With respect to a *prima facie* case, Eckhardt was 58 years old when his salary was reduced, and is a member of a protected class. It is undisputed that he was qualified for his job. There is also no dispute that Eckhardt suffered an adverse employment action – his annual salary was reduced by $39,000.

However, Eckhardt was not alone in experiencing a salary reduction. Five other NSI employees, including Andrew, also experienced salary reductions. Herzog's salary was reduced by $15,000, Weeks' salary was reduced by $7,500, Andrew's and Marsicek's salaries were reduced by $5,000, and Raap's salary was reduced by $4,400. As of October 2002, Weeks was 41 and Andrew was 31.[9] There is no evidence of Herzog's and Marsicek's ages.

In determining whether two employees are directly comparable for purposes of establishing a *prima facie* case of discrimination, a court looks at all relevant factors, such as whether the employees (i) held the same job description, (ii) were subject to the same standards, (iii) were subordinate to the same supervisor, and (iv) had comparable experience, education, and other qualifications – provided the employer considered these latter factors in making the personnel decision. *Ajayi v. Aramark Bus. Serv., Inc.*, 336 F.3d 520, 532 (7th Cir. 2003). To be

---

[9]In the age discrimination context, the fact that someone "substantially younger" was treated more favorably than a plaintiff is a reliable indicator of age discrimination. *See Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 321-22 (7th Cir. 2003) (citing *O'Connor v. Consol. Coin Caterers Corp.*, 411 U.S. 308, 311 (1996)). The Seventh Circuit has defined "substantially younger" as generally ten years younger. *Balderston*, 328 F.3d at 322.

considered similarly situated an employee must be "directly comparable in all material respects."
*Jordan v. City of Gary*, 396 F.3d 825, 836 (7th Cir. 2005)

Eckhardt compares himself to Andrew and the employees he identifies as the "younger project managers" – Weeks, Marsicek and Raap. However, Andrew, Weeks, Marsicek and Raap were not similarly situated to Eckhardt because they did not hold the same or equivalent positions as Eckhardt. Eckhardt was NSI's sole project manager and there is no evidence indicating that any other employee performed substantially similar job functions. Additionally, it is undisputed that the estimators and Andrew prepared estimates for placing bids and obtaining new projects. Eckhardt had some oversight responsibilities in reviewing bids for new projects and also worked on extra work and change orders. Eckhardt was also skilled in reviewing complex plans and specifications.

However, unlike Weeks, Marsicek, Raap, and Andrew, Eckhardt did not create new bids and did not use the Accu-Bid system. Unlike Eckhardt, these individuals primarily performed estimates and brought in new business. They all used the Accu-Bid computer program to prepare their bids. Eckhardt did not use Accu-Bid or any computer software.

As the project manager, Eckhardt supervised and managed projects. His responsibilities included preparing and monitoring all estimating and negotiating of change orders and extra work orders if there were modifications to a project under his management. Eckhardt's position as project manager also included overseeing estimates prepared by estimators for larger projects. However, unlike the estimators, Eckhardt's involvement with estimates generally occurred only after NSI had secured a project contract. As an indication of his unique role at NSI

(differentiating him from the estimators and Andrew), Eckhardt's salary made him NSI's highest paid employee.

Despite construing the evidence in the light most favorable to Eckhardt, he has not identified any similarly-situated, substantially younger employee, who was treated more favorably. Thus, Eckhardt has not met his burden of establishing a *prima facie* case of age discrimination based on his salary reduction. Absent a *prima facie* case, under the indirect method of proof, Eckhardt's salary reduction age discrimination claim fails.

Even if Eckhardt established a *prima facie* case, NSI has articulated a legitimate non-discriminatory reason for reducing employee salaries. Because of adverse financial circumstances in 2000 through 2002, and the inadequacy of prior cost saving efforts, Lee believed it necessary to reduce NSI's costs by reducing the salaries. Effective August 15, 2002, the salaries of office staff – including Eckhardt – were reduced. For 2002, neither Lee nor Kate received any salary from NSI. A decline in business and attempts to cut costs provide NSI with a legitimate non-discriminatory reason for its decision to reduce Eckhardt's salary. *See Chiramonte v. Fashion Bed Group, Inc.,* 129 F.3d 391, 398 (7th Cir. 1997) (company's need to reduce operating costs was a legitimate non-discriminatory reason).

While Eckhardt's salary cut was greater than the salary cuts imposed on other NSI workers, Lee's goal was to reduce employee wages as much as possible while still leaving each employee with a livable wage. Since Eckhardt's wage was the highest, his wage could sustain the greatest reduction and still remain a liveable wage. The courts do not sit as super personnel

-22-

departments, second-guessing an employer's facially legitimate business decisions. *See generally Wells v. Unisource Worldwide, Inc.*, 289 F.3d 1001, 1007 (7th Cir. 2002).

NSI's legitimate non-discriminatory reason would shift the burden to Eckhardt to prove that NSI's stated reasons are simply pretext for age discrimination. "To show that an employer's proffered reason is pretextual, a plaintiff must do more than demonstrate that the employer made a mistake . . . . Instead, the plaintiff must demonstrate the employer's reason is unworthy of belief." *Koski v. Standex Int'l Corp.*, 307 F.3d 672, 677 (7th Cir. 2002). To do this, a plaintiff may show: "(1) the proffered reasons are factually baseless, (2) the proffered reasons were not the actual motivation for the [salary reduction], or (3) the proffered reasons were insufficient to motivate the [salary reduction]." *Id.*

There is no evidence that Lee did not genuinely believe that NSI was in financial trouble and needed to reduce employee salaries to assure the company's viability. NSI relies upon the relative ages of Lee and Eckhardt asserting that the fact the decision-maker was older than Eckhardt undermines Eckhardt's claim that the decision was based on age. However, a line of cases to that end was discredited. *See Kadas v. MCI Systemhouse Corp.*, 255 F.3d 359, 361 (7th Cir. 2001) ("The relative ages of the terminating and terminated employee are relatively unimportant for purposes of demonstrating age discrimination in employment.").

However, having not seen NSI's financial records, Eckhardt is not in a position to refute NSI's claimed need. Further, in 2002 alone, NSI took a number of steps to reduce costs before reducing employee salaries. Among other cuts, NSI dispensed with apprentices, cancelled office cleaning services, changed phone companies, and did not fill open positions created by

-23-

departing employees. Additionally, neither Lee nor Kate took any compensation from the company during 2002. Eckhardt did not bear the hardship occasioned by NSI's financial difficulties alone.

There is no disparate treatment under the ADEA when the factor motivating the employer is some feature other than age. *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 609 (1993). "When the employer's decision *is* wholly motivated by factors other than age, the problem of inaccurate and stigmatizing stereotypes disappears. This is true even if the motivating factor is correlated with age." *Id*. at 611. Here, the motivating factor was salary level. *See Thomure v. Phillips Furniture Co.*, 30 F.3d 1020 (8th Cir. 1994). And, though the oldest NSI employee had the highest salary, under these circumstances, the correlation is of no import.

As succinctly stated in *Finnegan v. Trans World Airlines, Inc.*, 967 F.2d 1161, 1164-65 (7th Cir. 1992):

> Across-the-board cuts in wages and fringe benefits necessitated by business downturns or setbacks are a far cry from the situations that brought the theory into being. These cuts are not a legacy of deliberate discrimination on grounds of age; they are not the product of inertia or insensitivity. They are an unavoidable response to adversity. Their adverse impact on older workers is unavoidable too, because it is impossible to reduce the costs of fringe benefits without making deeper cuts in the benefits of older workers, simply because, by virtue of being older, they have greater benefits. In this situation no inference of discrimination, whether deliberate or merely inadvertent (but avoidable), can be drawn from the greater impact of curtailing employees' benefits on older workers. Otherwise every time a company tried to reduce its labor costs the federal courts would be dragged in and asked to redesign the reduction so as to shift the burden to some unprotected class of workers--a shift that might incidentally be impossible to accomplish, as it might drive all the younger workers out of the company.

Having considered both the direct and indirect methods of proof and despite construing reasonable inferences in the light most favorable to Eckhardt, a reasonable jury could

-24-

not find in his favor on his ADEA salary reduction claim. Therefore, that claim will be dismissed upon summary judgment.

*Job Termination – Direct Evidence*

As direct evidence of discrimination when his job was terminated, Eckhardt asserts that NSI retained four younger employees as estimators and those individuals absorbed his project management duties. He asserts that the only estimating qualification which he lacked was proficiency in the Accu-Bid computer program, which he could have learned. The record is not entirely clear as to how much training was necessary to learn the Accu-Bid computer program. Raap was given in-house training by Marsicek and also attended a two-day formal Accu-Bid seminar in January 2002 but, even with such training, he was not proficient with the system when Eckhardt's employment was terminated. Weeks apparently had learned a computer estimating system before beginning his employment with NSI.

Eckhardt did not use the computer in his office. Marsicek believes that Eckhardt does not even know how to turn on a computer. There is no evidence as to how much Accu-Bid training would be required for a non-computer user.

To the extent that the retention of younger persons and the ability to learn the relevant computer skills is arguably circumstantial evidence of age discrimination, Eckhardt has not presented evidence of his ability to learn the estimating program. Absent such evidence, a reasonable jury could not conclude that NSI discriminated against him based on his age.

Eckhardt also refers to the wage reduction, and the retirement and the new regime comments as being direct evidence of age discrimination. Once again, given the fact that such

-25-

comments span a two- to three-year period, they lack the temporal connection to the termination decision and are not direct evidence of age discrimination in NSI's termination of Eckhardt's employment. Further, all office employees had their wages reduced and the reductions were as large as possible while still providing a liveable wage. Taken together and viewed in the light most favorable to Eckhardt, his direct and circumstantial evidence of age discrimination in the termination of his employment, is insufficient evidence upon which a jury could find in his favor.

*Job Termination – Indirect Proof*

As to indirect proof of age discrimination with respect to the termination of his employment, Eckhardt satisfies the first three elements of a *prima facie* case. He was within the protected class, performing his job satisfactorily and sustained an adverse job action.

When a discrimination case involves a reduction-in-force ("RIF"), where an employer eliminates a position from the workplace, the fourth prong of a *prima facie* case is modified. *See Balderston*, 328 F.3d at 321; *Krchnavy v. Limagrain Genetics Corp.*, 294 F.3d 871, 875-76 (7th Cir. 2002). The test is further modified for a mini-RIF, where employees remaining at the company absorb the duties of their former co-workers. *Krchnavy,* 294 F.3d at 876. In such a case, the plaintiff is required to demonstrate that his duties were absorbed by employees who were not members of the protected class *Id*. A plaintiff must also show that he is similarly situated with respect to performance, qualifications, and conduct and that the retained employees possessed analogous attributes. *Id.* at 875*; see Balderston*, 328 F.3d at 321-22; *Schuster v. Lucent Tech., Inc.*, 327 F.3d 569, 574 (7th Cir. 2003). *But see*, *Miller v Borden, Inc*, 168 F.3d 308, 313 n.2 (7th Cir. 1999).

Eckhardt's oversight responsibility for two projects was absorbed by Lee, his elder. One project was assumed by Weeks; the other project by Andrew. Both Weeks and Andrew qualify as being "substantially younger" than Eckhardt. However, due to their skills in estimating for new projects and the use of the Accu-Bid programs, they were not similarly situated to Eckhardt. Eckhardt lacked the relevant skills in creating new bids and using the Accu-Bid program. Therefore, Eckhardt has not established a *prima facie* case with respect to the termination of his employment based on age.

Even if Eckhardt had established a *prima facie* case, NSI has articulated a legitimate non-discriminatory reason for the termination of his employment. Lee believed that NSI needed to further cut costs by eliminating Eckhardt's salary (as well as Herzog's). He believed that such positions were expendable because NSI lacked sufficient work requiring their skills.

In attempting to show the articulated reasons are pretextual, Eckhardt notes that the termination of his and Herzog's employment occurred six weeks after the salary reductions and under almost the same financial situation. He also points out that, in the months prior to his termination, NSI purchased three new vehicles. To show pretext in an RIF case, an employee must show that an improper motive "tipped the balance" in favor of discharge. *Id*. It is insufficient "for the employee to show that the employer acted incorrectly or undesirably by firing him;" instead, "the employee must show that the employer did not honestly believe the reasons it gave for firing him." *Id*. (citation omitted).

While NSI bought three new vehicles, it did not pay the entire purchase price of those vehicles at the time of purchase. Rather, it spread those costs out by making monthly installment payments. So, NSI's monthly expenditures did not change significantly. The mere fact that NSI bought new vehicles, while also reducing salaries and terminating jobs, does not demonstrate that NSI honestly did not believe the reasons it gave for terminating the employment of Herzog and Eckhardt. *Id.* Employees and vehicles are not fungible.

Moreover, Weeks and Andrew were primarily estimators – they performed tasks using Accu-Bid. Eckhardt was not an estimator and did not use Accu-Bid. Overall, Eckhardt did not bring in new business and that was a focus that Lee believed was critical to turn around NSI's financial situation.

In his brief, Eckhardt also states that NSI hired two new employees and gave existing employees promotions, raises, and bonuses. NSI did hire one new employee, Weeks, an estimator in April 2002, almost four months prior to the wage reduction and over five months prior to the termination of Eckhardt's employment. Weeks was hired in an effort to employ more estimators to snare new contracts. There is no evidence that NSI hired a second employee during the relevant time period.

Additionally, Eckhardt was the only NSI worker who received a bonus during 2002; in fact, he received two bonuses. There is no evidence of promotions or raises received by other employees in 2002. Neither Kate nor Lee were paid for their work in 2002. Neither Kate nor Lee received a bonus in 2002.

In his brief, Eckhardt also states that his employment was terminated because he lacked computer skills, not because he lacked estimating skills. (Pl.'s Reply Br. in Opp'n to Def.'s Mot. for Summ. J. at 13, 14.) Even if that was established, such reason would not violate the ADEA. The "ADEA commands that 'employers are to evaluate [older] employees . . . on their merits not on their age.'" *Hazen Paper Co.*, 507 U.S. at 611 (internal citation omitted). Identifying a deficiency in computer skills would be a merits-based decision, not an age-based decision, even if that factor tended to encompass more older workers. *Id.*

In light of the foregoing and having considered the direct and indirect methods of proving a discrimination claim, and despite construing the evidence in the light most favorable to Eckhardt, his ADEA job termination claim is dismissed upon summary judgment.

*Other Claims*

Eckhardt has not responded to NSI's contentions regarding his ADEA claims for demotion, failure to rehire, and retaliation, or his Title VII claims and WFEA claims. This Court's role does not include making arguments on behalf of parties. *See e.g., Spath v. Hayes Wheels Int'l-Indiana Inc.*, 211 F.3d 392, 397 (7th Cir. 2000). At this stage of the proceedings, a plaintiff must present evidence upon which a reasonable jury could find that he is entitled to relief. *Koszola v. Bd. of Educ.*, 385 F.3d 1104, 1111 (7th Cir. 2004) ("Summary judgment 'is the "put up or shut up" moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events.'" (citations omitted)).

Eckhardt does not dispute NSI's contentions that with respect to his ADEA demotion claim he can not prove a *prima facie* case that his demotion violated the ADEA, or that

NSI had a legitimate non-discriminatory reason to remove Eckhardt's title. He does not dispute the lack of evidence of pretext in the decision to remove his title. Further, Eckhardt has not responded to NSI's contentions that his failure-to-rehire and retaliation claims are outside the scope of his administrative charge of discrimination.

A plaintiff may not bring claims in a lawsuit that were not included in his EEOC charge. *See Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 47 (1974); *Cable v. Ivy Tech State Coll.*, 200 F.3d 467, 476 -77 (7th Cir. 1999); *Cheek v. Peabody Coal Co.*, 97 F.3d 200, 202 (7th Cir. 1996). A claim falls within the scope of the EEOC complaint if it is "like or reasonably related to" the charges in the EEOC complaint and if it "reasonably could have developed from the EEOC's investigation of the charges before it." *Cheek*, 97 F.3d at 202.

Eckhardt's administrative discrimination charge did not include any allegations of NSI's failure to rehire Eckhardt or retaliation against him. A court cannot infer retaliation from a different claim. *See O'Rourke v. Cont' l Cas. Co.*, 983 F.2d 94, 97 (7th Cir. 1993) (refusing to infer retaliation from a claim of age discrimination). Only in those cases where claims not explicitly set forth in an EEOC complaint "reasonably could be expected to grow out of an EEOC investigation of the [initial EEOC] charge" can this inference be made. *Peters v. Renaissance Hotel Operating Co.*, 307 F.3d 535, 550 (7th Cir. 2002). This requirement serves to enhance the administrative enforcement process by ensuring that the EEOC can conduct a full investigation while also providing the employer with advance notice of the claim and an opportunity to resolve the dispute. *See Harper v. Godfrey Co.*, 45 F.3d 143, 148 (7th Cir. 1995); *Steffen v. Meridian Life Ins. Co.*, 859 F.2d 534, 544 (7th Cir. 1988). Eckhardt's administrative charge of age

discrimination based on his demotion, reduced salary and the termination of his employment did not provide any indication of a claims for failure to rehire or retaliation.  Therefore, Eckhardt may not proceed on his failure to rehire or retaliation claims and those claims are dismissed.

Eckhardt has presented no direct evidence that the demotion in the form of Lee's removal of the vice president title from Eckhardt's position was the result of age discrimination. With respect to the fourth prong of the proof of a *prima facie* case based on indirect evidence, Eckhardt has presented no evidence of another similarly situated, substantially younger, NSI employee – one with the vice president title who called a co-worker a derogatory term to a vendor or other business contact – who was treated differently than he.  Even if Eckhardt made such a showing,  NSI has articulated a legitimate non-discriminatory reason for its action – it felt that Eckhardt's use of the derogatory term in referring to the NSI purchasing manager harmed NSI's professional image.  Eckhardt has not discredited that reason or revealed it as a pretext for age discrimination.

In light of the foregoing, Eckhardt has failed to carry his burden of presenting evidence upon which a reasonable jury would conclude that NSI discriminated against him based on his age by demoting him.  Thus, Eckhardt's ADEA demotion claim is dismissed.

NSI's refutation of Eckhardt's Title VII and WFEA claims has gone unanswered. Under Title VII of the Civil Rights Act of 1964, it is unlawful "for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  NSI is

-31-

correct that Title VII does not provide a cause of action for alleged age discrimination. Additionally, it is well-settled that the WFEA does not afford a private cause of action. *See e.g., Reed v. Johnson Controls*, 704 F. Supp. 170 (E.D. Wis. 1989). Therefore, Eckhardt's Title VII and WFEA claims are dismissed.

Based on the foregoing, NSI's motion for summary judgment is granted and this action is dismissed.

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:**

Eckhardt's motion to exclude NSI's March 14, 2005, reply filings (Docket No. 47) is **DENIED**;

NSI's motion for summary judgment (Docket No. 26) is **GRANTED** and this action is **DISMISSED**; and,

The Clerk of Court is **DIRECTED** to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 9th day of June, 2005.

**BY THE COURT**

**s/ Rudolph T. Randa**

_____

**Hon. Rudolph T. Randa**
**Chief Judge**